Merchants Bank *vs.* Marine Bank.—1845.

---

THE MERCHANTS BANK *vs.* THE MARINE BANK.—*June* 1845.

On the 20th September 1839, the *Marine Bank* issued their certificate of deposite, payable to *S* or order. It was mailed for *St. Louis*, and an endorsement by *S*, forged, when it was passed to *B* of *Illinois*, for value, *bona fide;* that house remitted it to *H* of *New York*, who remitted it to *W* of *Baltimore*, customers of, who deposited it with the *Merchants Bank* for collection, and obtained a credit for it in account, on the 2nd November. On the 4th, the *Marine Bank* paid it to the *Merchants Bank*. On the 21st, the former institution discovered the forgery, immediately gave notice to the latter bank, and demanded its payment. Between the 2nd and 18th November, *W* had always to his credit with the *Merchants Bank*, a larger sum than the amount of the certificate. On the 19th it was less, but on the 20th, 21st and 22nd, it was again greater. There were daily transactions deposites and checks, by *W*, with and on the *Merchants Bank*. The *Marine Bank* having paid the certificate to the real payee, brought an action against the other bank, which it had also paid previously, to recover back the amount of the certificate. HELD:

1st. That if the *Merchants Bank* was a *bona fide* holder of the certificate, for value paid, it would not have been responsible in this action,

2nd. There was evidence, that on the day on which the forgery was dis-
covered, and the demand made on the defendants to refund the money,
that there was standing to the credit of *W*, on the books of the *Merchants
Bank*, a larger sum than the amount of the certificate.

3rd. If at the time the forgery was discovered, and the demand of payment
made, *W* had withdrawn from the *Merchants Bank* the balance to his credit,
the *Merchants Bank* would then have been a *bona fide* holder for value.

4th. The credit to *W* on the books of the bank for the amount of the certifi-
cate was not conclusive, and did not prevent the bank from correcting
the account when the forgery was discovered; if it then had funds in their
possession adequate to that purpose, the credit was only *prima facie*
evidence.

The cashier of a bank possesses no incidental authority to make any decla-
rations binding the bank, not within the scope of his ordinary duties.

If the cashier of a bank promise to pay a debt which the corporation did not
owe, or was not liable to pay, or should admit forged bills to be genuine,
such promise or admission would not bind the bank, unless it had autho-
rized or adopted the act.

An agreement of facts made, and filed in a cause prior to its first trial,
which after judgment was reversed upon appeal, is competent evidence
upon a second trial, under a *procedendo*.

APPEAL from *Baltimore* county court.

This was an action of *assumpsit*, docketted by consent to
January term 1840, by the appellees against the appellants.

The general issue only was pleaded.

At May term 1840, the parties filed the following statement,
signed by counsel:

*Joel Vickers*, on the 20th September 1839, deposited in the
*Marine Bank of Baltimore* $762, and received therefor the
annexed certificate of deposite, which, it is admitted, is the usual
form of certificate of deposite in the banks of this city. *J.
Strodtmann*, to whose order said certificate was made payable,
was personally unknown to the officers of said bank, had never
been among its customers, and never had any previous trans-
action with the bank. The hand-writing of *Strodtmann* was
unknown to the officers of the bank, but it is admitted, that
after the deposite was made, *Philip Littig, Jr.*, Cashier of the
*Marine Bank*, received from a brother-in-law of *J. Strodt-
mann*, a signature of —— *Strodtmann*, as he stated at the time,
which the said cashier pasted in the signature or firm book of
the bank, but without informing any of the clerks of the bank

13    v.3

that he had done so, nor was it, in his opinion, material, according to the usage of that bank, as certificates are usually given for the use of persons at a distance, as payees, whose signatures it is not the practice of the bank to obtain. It is admitted, that the signature of *J. Strodtmann*, pasted in the signature book as aforesaid, was genuine, and that the officers of said bank had access to said signature book, as well as to all the other books of the bank. The certificate was, on the 20th September 1839, enclosed by —— ——— in a letter directed to *St. Louis*. It was never received by said *Strodtmann*, but fell into the hands of some other person who forged thereon the endorsement of said *Strodtmann*, and passed it for a valuable consideration to *B. Godfrey & Co.*, of *Alton*, in the State of *Illinois*, who endorsed and transmitted to *Howes, Godfrey and Robinson*, of *New York*, who also endorsed and transmitted it to *Weld and Jenks* of *Baltimore*, who kept an account with the *Merchants Bank of Baltimore*, in which account they were credited with this certificate on the 2nd day of November 1839, as cash, or endorsing and delivering said certificate to said bank. On the 4th November 1839, the *Merchants Bank* presented said certificate for payment at the *Marine Bank*, and obtained the amount thereof. On the 21st of November ensuing, the forgery was discovered upon the complaint of the brother-in-law of *Strodtmann*, that said certificate had never come to hand, although an unusually long time had elapsed since its transmission. Immediately upon the discovery, and upon the same day, the *Marine Bank* gave notice to the *Merchants Bank* of the forgery, and demanded a return of the money paid to the *Merchants Bank* as the bearer of the certificate, the *Marine Bank* having since and before the institution of this suit paid *J. Strodtmann*, the payee of said certificate, the amount thereof. The question is submitted to the court upon the foregoing statement of facts, whether the *Marine Bank* is entitled to recover from the *Merchants Bank* the amount so paid. The annexed copy of the certificate, and of the endorsements thereon, it is agreed shall be received as a part of this statement.

The copy of certificate and endorsement above referred to is in the form following:

"$762.   *Marine Bank of Baltimore.   Baltimore, September* 20*th*, 1839.   *J. Strodtmann* has credit for seven hundred and sixty-two dollars in the *Marine Bank of Baltimore*, subject to his order on the return of this certificate, deposited by *Joel Vickers.*   Signed, *Philip Littig, Jr., Cashier.*"

Endorsed, "Pay to the order of *B. Godfrey & Co.   J. Strodtmann.*   Pay *Howes, Godfrey and Robinson*, or their order. *B. Godfrey & Co.*   Pay *Weld and Jenks, Howes, Godfrey and Robinson.   Weld and Jenks.*"

"The *Marine Bank of Baltimore* paid the amount of the within certificate to the *Merchants Bank of Baltimore*, on the 4th November 1839.   *D. Sprigg, Cashier.*"

"January 10th, 1840.   Received payment of the *Marine Bank of Baltimore.   J. Strodtmann.*"

(Written in red ink on the face.)   "Number one hundred and seventy-four, seven hundred and sixty-two dollars.   *Louis F. Smith, B'k.*"

At January term 1841, the cause was tried and a verdict rendered for the defendants.   The plaintiffs, now appellees, appealed; and in the Court of Appeals the record was amended by a further agreement to insert, in the statement of facts in the fourth sentence thereof, the following words, " after said certificate of deposit was issued, and before it was presented for payment to said *Marine Bank*," so that said sentence shall read as follows—"*Philip Littig, Jr., Cashier* of the *Marine Bank*, after said certificate of deposite was issued, and before it was presented for payment to said *Marine Bank*, received," &c. That the *Marine Bank*, at the time of paying, and the *Merchants Bank* at the time of receiving the amount of the certificate of deposite, on November 4th, 1839, were both ignorant of the forgery; also, that the name of *Strodtman* was correctly written "mann" in the body of the certificate, while the forged endorsement was written "*man.*"

And the judgment was reversed and the cause remanded.

At the second trial in the county court, the plaintiffs obtained a verdict, and the defendants below prosecuted this appeal.

1st EXCEPTION.   At the trial of the case, the plaintiffs to maintain the issue on their part, offered to read in evidence to

the jury the statement of facts agreed upon by the counsel of the parties, and submitted to the county court upon the previous trial of the cause, to the admissibility of which, as evidence in this trial, the defendant objected; but the court overruled the objection, and permitted the said statement to be read in evidence, and it was accordingly read to the jury by the plaintiffs, to which the defendant excepted.

The plaintiff next proved by *Louis E. Smith*, an officer of the *Marine Bank*, that on the day the forgery was discovered, he apprised *Mr. Sprigg*, the cashier of the defendant, of the fact of the forgery, and demanded payment of the amount previously paid to the defendant by the *Marine Bank* on said certificate; that *Mr. Sprigg* gave it as his opinion that the defendant was both legally and morally bound to refund the amount, but asked a short time for consultation with *Weld* and *Jenks*, who had deposited the certificate with the defendant, and promised to give an answer upon the subject in about half an hour; that after the lapse of the time appointed, or thereabouts, the witness called again, and told *Sprigg* that the *Marine Bank* was anxious to have a positive answer, as the brother-in-law of *Strodtman* was waiting to receive one; that *Sprigg* then informed the witness that it was all right, and that the amount would be refunded; that the witness then asked him, (*Sprigg*,) for the amount, and that *Sprigg*, with a view as witness supposed, of directing the teller of the defendant to pay the amount, advanced towards said teller, but finding the latter busy stopped; that witness then asked him if the matter was to be considered settled, to which *Sprigg* replied yes, and authorised witness to have it sent in the lists which are exchanged every morning between the banks; that from the usage among bank officers so to do, he relied as confidently on the statement of *Sprigg* that it would be done, as if it was done, and witness therefore considered the promise of *Sprigg*, and the direction to send in the certificate, as equivalent to the allowance of a credit to the *Marine Bank* to the amount of the certificate, and an absolute settlement of the transaction; that with this understanding witness returned to the *Marine Bank*, and communicated the result of his interview, and immediately thereupon,

and in consequence of the assurance of *Sprigg*, the brother-in-law of *Strodtman*, was instructed by the *Marine Bank* to inform him, (*Strodtman*,) that the amount of the certificate was held by the *Marine Bank*, subject to his order, and that *Strodtman*, being thus informed, came on from *St. Louis* to *Baltimore*, and the amount was paid to him by the plaintiffs upon the 10th January 1840, as appears from the endorsement upon the certificate; that no entry however was made in the books of the plaintiff's bank, shewing that this amount was passed to the credit of *Strodtman*, and no memorandum in writing was made of the promise to the brother-in-law. The plaintiffs then gave in evidence by the same witness, the check list of the plaintiffs of the 22nd of November 1839, and that said list was transmitted by the plaintiffs to the defendant on the following morning, to wit, on the 23rd of November.

"MERCHANTS, *Nov'r* 22, '39.

| | |
|---|---|
| A | 80 |
| C | 40 |
| | 33 37 |
| | 50 |
| | 203 37 |
| Not (in pencil,) | 762 |
| | 965 37 |
| | 3490 10 |
| | 2524 73 |

Paid *Mr. Dorsey* seven hundred and sixty-two dollars, to be settled this day, November 23rd 1839. *Marine.*"

And that the item of $762, appearing on that day in said list, was for the certificate of deposite given in evidence, which was also sent in to the defendant upon the morning of the 23rd of November, in pursuance of the previous direction of *Sprigg*; and further proved by said witness, that according to the usage and practice of banks, the check list dated on any particular day, is not sent in by one bank to another until the day following its date.

The defendent then to maintain the issue on its part joined, read in evidence the testimony taken under the commissions sent for that purpose to *Alton, Illinois,* and *New York* city.

Deposition of *Winthrop S. Gilman* for the defendants: I saw the check marked A on or about the 8th October, A. D. 1839, when it was presented at the counting room of *B. Godfrey & Co.* for sale, by and in possession of a young man introduced to me by *George W. Fox,* whose name was *John Strodtman.* The firm of *B. Godfrey & Co.* purchased said check on the 8th October, A. D. 1839, from *Mr. John Strodtman* aforesaid, and gave him for same one and a half per cent. premium, paying him two hundred dollars cash, and the balance in two notes of hand, payable forty days from the 8th of October 1839, and due on the 17th and 20th November 1839, which said notes were paid by said firm of *B. Godfrey & Co.* I knew a person by the name of *John Strodtman* in October 1839, who had resided with *Mr. George W. Fox,* near *Alton,* but who stated he was then residing in *St. Louis.* I do not know when he left *Alton,* or where he is now residing. I was first informed that the first endorsement on the back of said check was a forgery, through a letter from *Messrs. Howes, Godfrey* and *Robinson* to *B. Godfrey & Co.,* dated New York, 29th November 1839, and received by them on the 13th December, A. D. 1839, about which time said letter was seen by me. Neither myself nor the firm of *B. Godfrey & Co.,* to my knowledge, had any notice that said endorsement was a forgery at the time of the purchase of said check by said firm. To my knowledge, the purchase of, and payment for said check by *B. Godfrey & Co.,* was a *bona fide* transaction. The firm were very careful in such purchases, and in this instance became satisfied that the interest in the check was really vested in the party offering it for sale. To the cross-interrogatory on the part of the plaintiff, he deposeth and saith, I first saw the check on or about the 8th day of October 1839, at the time it was offered for sale to *B. Godfrey & Co.,* and in the possession of *Mr. John Strodtman.* I was at that time a partner in the house of *B. Godfrey & Co.* Said certificate was purchased by said firm of *B. Godfrey & Co.,* and the agreement for price, and

the payment for the check, were made in *Alton*, as stated by me in my answer in chief. I had no previous acquaintance, nor had *B. Godfrey & Co.* any previous dealings with the seller of said check. He was recommended by *Mr. Fox* as a correct man, *Mr. Fox* himself being a man of respectable character. I do not now recollect whether I heard what *J. Strodtman's* business was at the time of the purchase of the check. The answers to the interrogatories in chief have been given on my personal knowledge, my recollection has been refreshed by recourse to the books of *B. Godfrey & Co.*, and I hereto annex a statement of the transaction as it appeared at the time, and as it has ever since appeared upon their books.

(B.)

*J. Strodtman.*

Dr. 1839—Oct. 31st.—To our note payable 17th,

|  |  |  |  |  |
|---|---|---|---|---|
|  |  | 20th Nov. 1839, - | $201 | 33 |
| " | " | To our note payable 17th, |  |  |
|  |  | 20th Nov. 1839, - | 375 | 91 |
| " | 8, | To cash, - - | 200 | 00 |
|  |  |  | $777 | 24 |

1829.—Cr.  Oct. 8th.—By certificate of deposite

|  |  |  |
|---|---|---|
| of *Marine Bank* of |  |  |
| *Baltimore*, - | $762 | 00 |
| By premium on do. 1½ |  |  |
| per ct., - - | 11 | 43 |
| By interest on our notes, | 3 | 81 |
|  | $777 | 24 |

Deposition of *Benjamin Ives Gilman*, was similar to *W. S. Gilman's*.

Deposition of *George W. Fox*, for the defendants. I first saw it, the certificate, in the hands of *John Strodtman*, who came from *St. Louis* to my house, and wished some advice as to negotiating, so that he might not be taken in. He shewed me a letter which he said was from his sister, written in *German*, and directed to him, advising him not to dispose of the certificate at less than its value. Said firm of *B. G. & Co.* did

purchase said check from *John Strodtman,* sometime in the autumn of 1839; said firm gave for said check one and a half per cent. premium. If I remember right, they gave $200 cash, and the balance in notes at 40 days. *S.* lived with me from March 1839, to September 18th, 1839. I resided about two miles and a half from *Alton.* After he left me he went to *St. Louis* to reside, and said he was going to buy a farm in *Missouri* after he received the money from his sister. I did not see him again until he came back with the check, sometime in the month of October following. As he came to me for advice, I told him there were merchants in *Alton* who were doubtless in want of eastern funds, and accordingly introduced him to *B. Godfrey & Co.* He was a farmer; I know not where he now is. I know of no other man by the name of *J.* or *John Strodtman* or *Strodtmann.* It was several months *after* he sold the check before I was informed that the name of *J. Strodtman* was a forgery. I was told by *Mr. Gilman,* one of the house of *B. Godfrey & Co.* I do remember that a man called at my house some months after the transaction, who said he was the real *John Strodtman,* making enquiry of me for the man who had worked for me by the name of *John Strodtman.* He wished to get information where the latter was, and said his real name was *Andrew,* if I remember right.

Deposition, *James Robinson* for the defendants. I have before seen the certificate marked A. I first saw it on or before the 23rd October 1839. It was received from *B. Godfrey & Co.,* by *H., G. & R.* It was enclosed in a letter from *B. Godfrey & Co.,* dated 9th October 1839, (being the letter hereto attached, marked C,) which was received by *H., G. & R.;* said letter was answered, (a copy of which letter is hereto attached, marked D.) The endorsement of *B. Godfrey & Co.,* on said certificate, I am well acquainted with, and have no doubt of its being genuine. The endorsement on the certificate of *H., G. and R.* is genuine; I am a member of the firm and wrote it myself. The firm of *B. G. & Co.* was established in the year 1839, at *Alton,* in the State of *Illinois,* and *H., G. and R.* was established at the same time in the city of *New York;* they did correspond and do business with each other during said

year. The character in which *H.*, *G. and R.* received said certificate, was that of a remittance against a large indebtedness which then existed against *B. G. & Co.*, and which indebtedness was caused by the purchase of goods for their account, the acceptance and payment of their drafts, and the payment of their notes and other business transactions, and said certificate was passed to their credit in account. *H., G. and R.* did pay said *B. G. & Co's* note to *Goodwin, Fisher and Spencer*, for $483, the day following the receipt of said certificate, say on the 24th of October 1839, which payment I do believe was made in consideration of the funds they expected to be realized of said certificate, and I do not think said $483 would otherwise have been paid. The account marked E is a statement of the account between the two firms, from the 23rd of October 1839, down to the 15th February 1844, which shews the debt existing when said certificate was received, and the balance due at the present time with interest thereon. Said certificate was remitted by *H., G. and R.* to *Weld and Jenks*, of *Baltimore*, on the 31st October 1839, in the letter marked B of that date; said letter was written by me. Said certificate was remitted to *W. and J.* for the purpose of collection, and providing them with funds which they were advised to pay on *H., G. and R's* account to *Capt. Barze*, of barque *Isabella*, and which they did pay out of the funds so collected from said certificate, to the amount of about $166. The notice of the first indorsement of *J. Strodtmann* on said certificate being a forgery, was first received by *H., G. and R.*, between the 23rd and 25th of November 1839, from *W. and J.*, by letter dated the 22nd November 1839, being the letter marked F. *H., G. and R.* gave notice of the forgery to *B. G. & Co.*, on the 29th November 1839, by letter, of which a copy is marked G. I stood in the relation of partner in the concern of *H., G. and R.*, in October and November 1839, and have remained in same relation since, except for one year from April 1840, and am now a partner. *B. G. & Co.* failed about the 23rd October 1839; first note of their's which to my knowledge was protested, was on that day. My knowledge of the time *B. G. & Co.* having made payment to *J. Strodtman* for the certificate

in question, is derived only from their letter of 19th December 1839, which is marked H, and which contains all the information I have of the time and mode of ultimate adjustment of said certificate. The amount of said certificate was passed to the credit of *B. G. & Co.* in account, as certificate of deposit in the *Marine Bank.* The account marked I, is a copy of the account from their books, from 23rd October 1839, to the 1st January 1840. The house of *B. Godfrey & Co.* were in good credit here until their notes were protested.

Deposition of *Theophilus Nelson,* for defendants. The certificate was received from *B. G. & Co.*, on account of an indebtedness to *H., G. and R.*, although *H., G. and R.* did further advance funds for account of *B. G. & Co.*, in anticipation of the payment of this certificate and other funds not then matured; the statement of the account between the firms from the time of the receipt of this certificate to this time is marked E. The certificate was remitted by *H., G. and R.* to *W. and J., Baltimore,* on the 31st October 1839; a letter marked B, now shewn me, was written by *James Robinson,* a member of the firm of *H., G. and R.*, and the certificate was enclosed therein to *W. and J.* The certificate was remitted to *Weld and Jenks* for collection, and to be credited to *H. G. and R.* in general account. *H., G. and R.* at the time designing said funds, or such part as might be required to meet the expenses of a vessel which they had sent to *Baltimore* to take cargo, and a part of which funds *Weld and Jenks* had used for that purpose previous to the discovery of the forgery. Notice of the forgery was first given to *B. Godfrey & Co.* on 29th November 1839, by letter, a copy of which marked G. During the months of October and November 1839, and since, was book-keeper for *H., G. and R.*, and am in that situation at the present time.

(B.)

*New York, 31st Oct.* 1839.

*Messrs. Weld and Jenks, Baltimore.*

Gent:—We enclose certificate of deposit in *Marine Bank of Baltimore,* by *J. Strodtmann,* for $762, which please collect and pass to our credit. *Capt. Barze,* of barque *Isabella,* now

Merchants Bank *vs.* Marine Bank.—1845.

on her way to your city, and chartered to load for *Havre*, will call upon you for some funds to pay his expenses, which please advance, and if in need of any assistance, we shall be obliged by your rendering them.

We remain your friends,

HOWES, GODFREY AND ROBINSON.

(C.)

*Alton, Oct. 9th, 1839.*

*Messrs. Howes, Godfrey and Robinson, New York.*

*Gent:*—Our last respects were under date 7th inst., inclosing *Norton Johnson's* draft, 2nd inst., 30 ds. st., on *Earp. and Bros., Phil.,* for $1000, which hope arrived safely. We now enclose certificate deposite in *Marine Bank of Baltimore*, dated September 20th, 1839, to order of *J. Strodtman*, for $762, which please place to our credit.

Your friends and serv'ts,

B. GODFREY, & Co., *by C. J. Gilman.*

(D.)

*New York, October 23rd, 1839.*

*Messrs. B. Godfrey & Co., Alton:*

*Gen:*—Yours of the 9th is received, covering certificate of deposite on *Baltimore* for $762, to cash, which we should to-day have to pay from 12 to 13⅔ discount, &c. We have advised *Goodwin, Fisher and Spencer,* that your note in their favor, due to-day, for $1031.67, would not be paid, giving them the reasons, and requesting that they should withdraw it from the bank, at the same time promising, that as soon as funds were realized, we would apply them to the payment of their note, crediting you with all remittances except the 30 days draft on *Earp. and Bros.,* and the certificate of $762 received to-day. Our cash account stands very nearly square, and as we think it certain, that when the news of the suspension reaches you, the rates of exchange on *New York* will advance as it has done in *Baltimore* and *Philadelphia*, or even higher, and in consequence that you will cease remitting, we have thought it highly inexpedient, even were it in our power, to undertake to protect your notes due in this month, &c.

Signed, HOWES, GODFREY AND ROBINSON.

(E.)

B. *Godfrey & Co.* in account with *Howes, Godfrey and Robinson.*

Dʀ.—1839,

| | | | | | |
|---|---|---|---|---|---|
| Oct'r. | 23. | To whole amount of debit to this date, - - - - | | | $43,881 23 |
| | 24. | " cash paid their note to *Goodwin, Fisher and Spencer*, - - | | | 483 00 |
| | 31. | " expenses collecting drafts, - | | | 1 20 |
| Nov'r. | 7. | " do. do. do., - | | | 1 35 |
| | 13. | " exchange on *Philadelphia* funds, | | | 127 50 |
| | 26. | " do. do. do., | | | 102 50 |
| Dec'r. | 28. | " do. do. do., | | | 128 33 |
| 1840, | | | | | |
| January 1. | | " postage, - - - - | | | 2 43 |
| | | " balance of interest, - - | | | 62 59 |
| | | | | | $44,790 13 |

| | | | | | |
|---|---|---|---|---|---|
| 1839, | | | | | Cʀ. |
| Oct'r. | 23. | By whole amount of credit to this date, - - - - | | | $35,223 84 |
| | " | " certificate of deposite in *Marine Bank, Baltimore*, - - | | | 762 00 |
| | 31. | " checks on *United States Bank, Philadelphia*, due Dec. 28, - | | | 1,509 81 |
| Nov'r. | 7. | " dft. *E. C. Delavan*, - - | | | 134 90 |
| 1840, | | | | | |
| January 1. | | " balance to debit this date, - | | | 7,159 58 |
| | | | | | $44,790 13 |

Dʀ.—1840.

| | | |
|---|---|---|
| January 1. To balance this date, - - - | | $7159 58 |
| " certificate of deposite on *Marine Bank, Baltimore*, - - - | | 762 00 |

This account was further stated until the 16th March 1841, when the balance due *H. G. and R.* was $4914.73; and on the 10th October 1842, when it was $2468.78.

(F.)

*Baltimore, November 22,* 1839.

*Messrs. Howes, Godfrey and Robinson—Gentlemen:* We received notice to-day from the *Merchants Bank,* where we keep our bank account, that they had this day received notice from the *Marine Bank,* that the signature purporting to be that of *J. Strodtmann* on the back of the certificate of deposite, issued subject to his order by the *Marine Bank,* is a counterfeit. The circumstances are these: *Mr. Joel Vickers,* of this city, deposited the money in the *Marine Bank,* in the name and for the benefit of *Mr. J. Strodtmann,* the *Marine Bank* giving a certificate of deposite, payable to the order of *J. Strodtmann,* on return of said certificate of deposite. We deposited it in the *Merchants Bank* on or about the 2nd of November instant, and that bank, in course of their usual exchange of checks and settlement of balances, sent said check in to *Marine Bank* the next morning as usual, and the amount thereof was duly passed to *Merchant Bank's* credit in settlement. *Mr. Joel Vickers,* who made the deposite in *Marine Bank,* has just received a letter from *J. Strodtmann,* dated *St. Louis, Missouri,* November 11, 1839, in which said *Strodtmann* advises of not having received any certificate of deposite, the receipt of which letter here has led to this developement. On comparing the endorsement of the certificate with *J. Strodtmann's* signature, in his letter, there appears no similarity. The *Marine Bank* did not know the signature of *J. Strodtmann,* never having taken it. It is customary to draw the money for checks on other banks, or have the checks endorsed by the teller before depositing said checks. Our clerk took this certificate of deposite to the *Marine Bank,* before depositing it in *Merchants Bank,* and asked the teller if it was necessary to have it endorsed like any ordinary check. The teller took the certificate, looked at it, and returned it to the clerk, saying it was not necessary to have it endorsed. We have, of course, assured the *Merchants Bank* we will hold them harmless in the premises, and we will look to you to make good that assurance. We wait your orders what course to pursue in regard to the *Marine Bank.* The *Marine Bank* demand of the *Merchants Bank,* that the amount be refunded; the matter stands open, waiting our action.

The endorsements are *J. Strodtmann* to *Godfrey & Co.*, or order, and by them to yourselves, or order, and by you to our order, and endorsed by us.

Your friends and servants,        WELD & JENKS.

(G.)

*New York, November 29th, 1839,*

*Messrs. B. Godfrey & Co., Alton.*

*Gentlemen:*—Some time since we received from you a certificate of deposite in the *Marine Bank of Baltimore*, for $762. The same was made payable to the order of *J. Strodtmann*, and by him endorsed. On the 31st October, we sent the same to our friends, *Weld* and *Jenks*, of *Baltimore*, to collect and pass to our credit, intending to draw for it as favorable opportunities offered. *Weld* and *Jenks* collected the certificate through the *Merchants Bank*, where they keep their account, on or about the 2nd instant. On the 22nd instant, they advised us of having received notice from the *Marine Bank*, that the name of *J. Strodtmann* was a forgery, and the *Marine Bank* demands a return of the money from the *Merchants Bank*, and the *Merchants Bank* from *Weld* and *Jenks*; the latter write to us for instructions. It appears that *Mr. Joel Vickers*, who made the deposite for *Mr. J. Strodtmann's* benefit, has received a letter from the latter, dated *St. Louis*, November 11, in which he says he has received no certificate of the kind; upon which information it is concluded, that the signature is a forgery; we have refrained so far from giving any direction to change the position of the draft, on account of our not knowing what would be the proper course to take. We have made several inquiries, but find it to be such a novel case, that hardly any one can venture an opinion with any degree of certainty. *Mr. Shipman*, however, thinks that the *Marine Bank* should have the amount refunded, and then hold it, (the original deposite,) subject to the order of the proper owner. We shall be glad to have your advice upon the subject as early as possible, and in the meantime, we shall endeavor to not move in the matter, without it may be actually necessary, or without we may become convinced of the proper course to pursue.

We remain, &c.,

(Signed,)     HOWES, GODFREY & ROBINSON.

Merchants Bank *vs.* Marine Bank,—1845.

*Alton, 17th December,* 1839.

*Messrs. B. Godfrey & Co., Alton.*

*Dear Sirs:*—The young man who sold you the check, or certificate deposite on *Marine Bank, Baltimore,* on 8th October last, came to live with me in March last, and remained with me till 18th September; his name was *John Strodtmann,* which I ascertained when he was subpœned last summer to attend a trial in *Alton.* On the 30th September, I settled with him, and hold his receipt, signed that day *J. Strodtmann.* He had intimated to my family, that he had money in the hands of a sister at the east, and about 8th October, he came to my house, stating he had received his money in a certificate of deposite, which was drawn to his order, and I had no doubt but it was correct. It was on the 8th October he sold the certificate to you, and if there be any thing wrong about it, it must be that there are two *J. Strodtmans,* for that was certainly his name, and I had no doubt of his being the identical *J. Strodtmann* in whose favor the certificate deposite was drawn.

(Signed,) GEO. W. FOX.

(H.)

*Alton, 19th December,* 1839.

*Messrs. Howes, Godfrey and Robinson, New York.*

*Sirs:*—Since ours of 25th October, &c., you will notice by the accompanying letter from *G. W. Fox,* (a very respectable farmer here,) that we bought the check of *J. Strodtman,* but as appears now, it is probable there were two Germans of that name. We do not wish it settled, except in accordance both with law and equity, and if you become convinced that it was our duty to know, that the *J. Strodtman* of whom we purchased, was the identical *J. Strodtman* alluded to in the certificate, and that it now proves that he was not the same, we suppose we must lose it. Your own judgment we commit it to, and shall be satisfied with any adjustment that is clearly right. If you have not forwarded our account current, please send it as early as possible, as we need on 1st January.

Yours truly, B. GODFREY & Co.

(I.)

Same as E, to debit of 1st January 1840.

The defendant then further proved, by *Daniel Sprigg*, its cashier, that on the day of the discovery of the forgery, upon the certificate of deposite given in evidence, *Mr. Smith*, of the *Marine Bank*, called upon the witness, with the certificate, and said that the endorsement of *J. Strodtman* thereon, was a forgery, and which was the first notice witness had, that said endorsement was a forgery, and that the party interested claimed a new certificate, and inquired as to the course the *Merchants Bank* would pursue; to this witness replied, that the defendant would certainly settle it, for that he, (the witness,) conceived it both legally and morally bound to refund the amount, but that *Weld* and *Jenks*, who deposited it, would be consulted, and their and witness' decision made known. That a messenger was sent to those gentlemen, and *Mr. Jenks*, of that firm came, and after being made acquainted with the circumstances, and the opinion of the witness, of the liability of the defendant to to the plaintiffs, and by consequence his to the defendant, he, (the said *Jenks*,) promptly differed in opinion, and stated that he did not consider the defendant or himself, legally or morally bound to return the amount. That said *Jenks* and the witness differed so widely in their views, that witness advised him, *Jenks*, to consult his counsel, and on being informed that he was out of town, witness proposed to send for the counsel of defendant, who witness was sure would confirm his views; this was agreed to, and witness accordingly sent for *Mr. Brown*, who appeared on the morning of the same day, and on relating the facts of the case to him, *Mr. Brown* said that witness was wrong, and *Mr. Jenks* right. That witness then stated what had taken place between him and *Mr. Smith*, including his, witness' promise to settle the amount of the certificate; and further said, it would be necessary for *Mr. Brown* to go over to the *Marine Bank*, and state to the said bank, that witness was in error in regard to the obligation of the defendant to refund. That witness also requested *Mr. Jenks* to acquaint the proper officers of the *Marine Bank* with his, *Jenks*', unwillingness that the defendant should refund the amount of the

certificate until after he should hear from his *New York* correspondents, from whom the certificate had been received. The said witness further testified, that in any engagement he had with *Mr. Smith,* he had regard, and he thinks express reference to the assent of *Messrs. Weld* and *Jenks,* whom he considered bound to defendant, if latter was bound to the plaintiffs, and that if those gentlemen objected, he could not pay it, and that he certainly made no promise to *Mr. Smith* after their objection.

The defendant then further proved, by *George William Brown,* that upon being sent for by *Mr. Sprigg,* as proved by that witness, he gave the opinion as counsel of the defendant, that it was not legally bound to refund the amount of the certificate to the plaintiffs, and that *Mr. Brune,* who was upon that day president pro tem., in the place of *Mr. Swan,* who was out of town, agreed with witness in this opinion; that upon his, (witness,) giving this opinion, he went over on the morning of the same day, at the request of *Mr. Sprigg,* to the *Marine Bank,* and informed the president of the plaintiffs, and witness thinks also the cashier, that *Mr. Sprigg* was in error as to the liability of the defendant; and further, witness gave the plaintiff's president, and he thinks cashier, notice not to send in the certificate in the exchange lists upon the following morning, as the defendant, as then advised, would not pay the same. The same witness also testified, that he met at the *Marine Bank, Mr. Jenks,* of the firm of *Weld & Jenks,* who, while witness was in said bank, came there for the same purpose with himself, and on coming out of said bank, witness also thinks he met with *Mr. Smith,* to whom he made the same communication.

The defendant then further proved, by *Richard Dorsey, Jr.,* that in 1839, he was runner of the defendant, and that it was then the daily practice of the runners of the banks, to take to the other banks, a list or statement of the items, with the vouchers, upon which the banks so sending claimed a credit, and at the other banks to which these were taken, they received from the tellers thereof a list and vouchers, upon which credit was claimed by them, and that the balance of these items were struck, and if not objected to by either party

before 11 o'clock on the morning of the day on which the exchange was made, the balance struck was considered settled; that sometimes, according to the practice, the runner of the defendant would go to the bank of the plaintiffs, and make with the teller of that bank the exchanges, and sometimes the runner of the *Marine Bank* would come to the *Merchants Bank*, and make with the teller of the latter bank the exchanges; that it was the practice for the teller of the one bank, and the runner of the other, at the bank where the exchange was made, to substract the items of credit claimed by the one bank, from those claimed by the other upon the lists, and for the officer of the bank, against whom the balance appeared, to enter the balance in a book kept for that purpose, and for the runner, upon returning to his own bank, to take with him this substraction and result, together with the vouchers obtained at the other bank, for the examination of his own teller, and if the statement of credits was not objected to by 11 o'clock in the morning of the same day, the account was considered closed.   The same witness also testified, that it was not the duty or business of the runners to examine the vouchers presented to them for credit at their bank, or to consider their correctness; that this was the business of the paying tellers, and that he, the witness, had no authority, while he was runner of the defendant, to bind it to the payment of money.   The same witness further proved, that upon the morning of the 23rd of November 1839, after the exchanges had been made between the plaintiffs and defendant, in accordance with the usage of the banks, as proved by the witness, the certificate of deposite, given in evidence, was delivered to the paying teller of the defendant, *Mr. Gill*, together with the other vouchers, upon which the *Marine Bank* claimed credit.   That *Mr. Gill* on seeing said certificate, immediately objected to receiving it, and to allow the credit claimed for it, and sent the witness to the *Marine Bank*, with the message, that he, (the said teller,) could not receive it.   That witness carried said certificate to the teller of the *Marine Bank*, and demanded the amount thereof, but received for answer from said teller, that *Mr. Sprigg* had told *Mr. Littig* or *Mr. Smith*, that it might be returned in the check list to the *Merchants Bank*.   That witness then returned to *Mr. Gill*, with

the certificate, and told him what *Mr. Miller* had said. That *Mr. Gill* gave the certificate back to the witness, and told him to tell *Mr. Miller*, that the *Marine Bank* must pay it, and that *Mr. Sprigg* could settle it with the *Marine Bank* himself. That witness accordingly returned the certificate to *Mr. Miller*, and obtained the amount for which credit had been refused, in order that *Mr. Gill* might adjust his account. That all this took place before 11 o'clock of the 23rd.

The defendant then further proved, by *William L. Gill*, that he is the paying teller of the defendant, and was such in 1839, and that on the morning of the 23rd of November, in that year, when the check list from the *Marine Bank* of the previous day given in evidence was brought to him, with the vouchers, upon which the *Marine Bank* claimed credit, the witness objected to allow a credit of $762, claimed on said list upon the certificate of deposite given in evidence. That witness wrote in pencil mark, the "not" upon said check lists opposite to said credit, to signify that he did not allow the same, and sent *Mr. Dorsey*, the runner, back with said certificate to the plaintiffs, to demand the amount of it from *Mr. Miller*. That *Mr. Dorsey* returned from the *Marine Bank*, and brought word from its officers, that *Mr. Sprigg* had said that it should be settled in this way; to this witness returned for answer by *Mr. Dorsey*, that this might be, but that witness could not receive it and allow the credit, and that the money must be paid. That the money was accordingly paid, and that these things took place before 11 o'clock of the said 23rd of November 1839. The said witness also proved, that by the custom of the banks, the tellers have until 11 o'clock of each day, to examine the items and vouchers upon which the other banks claim credit, and that by the custom, they may object to any items so claimed until that hour. That when any item is objected to, or not allowed, it is the custom to send the runner for the money to the amount of the item claimed, and when the money is thus obtained, the item is permitted to stand in the list and the account; but if the item is a large one, it is more usual to correct the item which gives more trouble. The same witness proved the practice of making exchanges between the banks, in the mode stated by the witness, *Dorsey*, and tes-

tified to the duties of the runners and tellers of banks, as given in evidence by the same witness, *Dorsey.*

The defendant then gave in evidence, the account between the defendant and *Messrs. Weld* and *Jenks,* from the 1st of November 1839, to the 1st of December of the same year, taken from the books of the defendant, shewing the balances upon each day during that period.

1839.

| | | |
|---|---|---:|
| Nov. 1. | Amount in bank, - - - | $6,648 56 |
| 2. | Deposited, $400—1500—762, - | 2,662 00 |
| | | $9,310 56 |
| " | Checks, - - - - - | 3,601 97 |
| | Balance, - - - - - | $5,708 59 |
| 4. | Balance, - - - - - | 6,041 11 |
| 5. | Balance, - - - - - | 7,010 99 |
| 6. | Balance, - - - - - | 7,361 80 |
| 7. | Balance, - - - - - | 2,818 58 |
| 8. | Balance, - - - - - | 1,916 74 |
| 9. | Balance, - - - - - | 2,467 36 |
| 11. | Balance, - - - - - | 2,011 79 |
| 12. | Balance, - - - - - | 3,976 58 |
| 13. | Balance, - - - - - | 2,376 58 |
| 14. | Balance, - - - - - | 2,114 60 |
| 15. | Balance, - - - - - | 802 10 |
| 16. | Balance, - - - - - | 1,447 50 |
| 18. | Balance, - - - - - | 411 78 |
| 19. | Balance, - - - - - | 57 77 |
| 20. | Balance, - - - - - | 500 83 |
| 21. | Balance, - - - - - | 1,768 03 |
| 22. | Balance, - - - - - | 6,696 03 |
| 23. | Balance, - - - - - | 3,071 60 |
| 25. | Balance, - - - - - | 3,435 60 |
| 26. | Balance, - - - - - | 1,921 33 |
| 27. | Balance, - - - - - | 121 33 |
| 28. | Balance, - - - - - | 3,345 85 |
| 29. | Balance in Bank, - - - | $3,391 65 |

From which it appears, that upon the evening of the 19th of November, and the morning of the 20th of the same month, 1839, *Weld* and *Jenks* had drawn out all the money which they had in the bank of the defendant, including the amount credited to them upon the certificate given in evidence, except the sum of $57.77.

The defendant likewise gave in evidence the by-laws of the defendant.

The plaintiffs then proved by *Mr. Miller*, the plaintiff's paying teller, that upon the 23rd November, when he paid the amount of the certificate to *Mr. Dorsey*, viz: $762, as given in evidence by that witness, this witness paid it with the understanding, that the amount was to be settled on that day by the defendant, and that he made a memorandum to that effect, at the time on the check list given in evidence, and would not have paid the amount without this understanding. The same witness further proved, that the whole of said check list is in the hand-writing of witness, except the word not, written with a lead pencil thereon. The same witness also gave evidence of the practice of banks in the city of *Baltimore*, and their tellers, when an item is claimed by one bank, and objected to by another, to the same effect as proved by the witness, *Gill*.

The defendants then further proved by the witness, *Dorsey*, that he had no recollection of promising *Mr. Miller* to repay the money received from *Mr. Miller*, on the day it was received. That if he did make such promise, it was based upon the statement of *Mr. Miller*, that *Sprigg* said it should be settled; that the writing upon the check list was made by *Miller* in witness' presence.

The defendant prayed the court to instruct the jury as follows:

1. That if they shall believe, from the testimony in this cause, that on the 20th of September 1839, *Mr. Joel Vickers* deposited in the *Marine Bank* $762, and received therefor the certificate of deposite given in evidence in this cause, payable to the order of *J. Strodtman*, and for the purpose of remitting the said certificate to said *Strodtman*, who was then at *Saint Louis*, and after said certificate was issued, and before it was presented

for payment to said *Marine Bank*, *Philip Littig*, *Jr.*, the cashier of said bank, received from a brother-in-law of said *Strodtman* a signature of said *Strodtman*, which he, thè said cashier, pasted in the signature or firm book of said bank; and if the jury shall further find, that said certificate was remitted to said *Strodtman*, but was never received by him, but fell into the hands of another person who passed under the name of *J. Strodtman*, that the said last mentioned *J. Strodtman* claiming to be the owner of said certificate, and the person to whom it was payable, forged thereon the name of *J. Strodtman*, and passed it for a valuable consideration to *Messrs. B. Godfrey & Co.*, of *Alton*, in the State of *Illinois*, who received the same *bona fide*, and without notice of said forgery. And if the jury shall further find, that said *B. Godfrey & Co.* endorsed and transmitted said certificate to *Messrs. Howes, Godfrey and Robinson*, of *New York*, who also, *bona fide* and without notice of said forgery, endorsed and transmitted it to *Weld and Jenks*, of *Baltimore*, who kept an account in the said *Merchants Bank*, in which account they were credited with said certificate on the 2nd November 1839, as cash, on endorsing and delivering said certificate to said bank, *bona fide*, and without having received notice of said forgery. And if the jury shall further find, that on the 4th day of November 1839, the *Merchants Bank*, *bona fide* and without having notice of said forgery, presented said certificate for payment at the *Marine Bank* and obtained the amount thereof. And if the jury shall further find, that neither the *Merchants Bank* nor *Marine Bank* discovered until the 22nd of November 1839, that the name of said *Strodtman* had been forged on the said certificate, then the plaintiff is not entitled to recover.

Rejected by the court, because it does not require the jury to find that defendants were holders for value.

2. That if they shall find the facts stated in the first prayer, the plaintiff is not entitled to recover, although they may further find, that on the 22nd of November 1839, the *Marine Bank*, on discovering the payment of said certificate to have been made under a forged endorsement, applied to the *Merchants Bank* to refund the amount, and that the cashier of the

latter bank replied, that he considered said bank legally and morally bound to return the money, and that said *Marine Bank* might send said certificate into the *Merchants Bank*, in the check list in the following morning, provided they further find, that after said declaration by the cashier, he was instructed by the counsel of said bank, and by the president pro tem. thereof, that in their opinion, the said bank was not bound to return said amount; and that he was also instructed by *Messrs. Weld and Jenks*, the previous endorsers on said certificate, that they had received it from their correspondents, *Howes, Godfrey and Robinson*, and that they, *Weld and Jenks*, would not consent that the *Merchants Bank* should pay back said certificate, unless compelled by law so to do, and that if said bank did so, they, the said *Weld and Jenks*, would not hold themselves answerable to said bank for the amount thereof; and provided the jury shall further find, that the said *Sprigg*, on the morning of the said day, the 22nd November 1839, after being so instructed by the counsel and president pro tem. of the bank, and *Weld and Jenks*, gave notice to said *Marine Bank* not to send in said check on the check list on the next morning, that the *Merchants Bank* could not, as then advised, return the money.

Rejected by court, because the prayer takes no notice of the time of the obligation of the *Marine Bank*.

3. That if they find the facts stated in the first prayer, and further find, that at the end of the 19th of November, and on the morning of the 20th of November 1839, and between the day when said certificate was deposited in said *Merchants Bank* by said *Weld and Jenks*, and credited to them as cash, and the day when said forgery was discovered and communicated to said bank; that they, the said *Weld and Jenks*, relying upon said credit, and in ignorance of said forgery, had drawn out all the money which they had in that bank, including the amount credited to them on certificate of deposite, except the sum of $57.77, then the plaintiffs are not entitled to recover, although they may further find, that on the 22nd of November 1839, the *Marine Bank*, on discovering the payment of said certificate to have been made under a forged endorsement, applied to the *Merchants Bank* to refund the amount, and that the cashier

of the latter bank replied, that he considered said bank legally and morally bound to return the money, and that said *Marine Bank* might send said certificate in to the *Merchants Bank* in the check list on the following morning; provided they further find, that after said declaration by the cashier, he was instructed by the counsel of said bank, and by the president pro tem. thereof, that in their opinion the said bank was not bound to return said amount; and that he was also instructed by *Messrs. Weld and Jenks,* the previous endorsers on said certificate, that they had received it from their correspondents, *Howes, Godfrey and Robinson,* and that they, *Weld and Jenks,* would not consent that the *Merchants Bank* should pay back said certificate unless compelled by law so to do, and that if said bank did so, they, the said *Weld and Jenks,* would not hold themselves answerable to said bank for the amount thereof; and provided the jury shall further find, that the said *Sprigg,* on the morning of the same day, the 22nd November 1839, after being so instructed by the counsel and president pro tem. of the bank, and *Weld and Jenks,* gave notice to said *Marine Bank* not to send in said check on the check list on the next morning, that the *Merchants Bank* could not, as then advised, return the money.

4. That if they find the facts stated in the 1st prayer, and if they shall further find, that at the end of the 19th of November, and on the morning of the 20th day of November 1839, and the day the said certificate was deposited in the said *Merchants Bank* by the said *Weld and Jenks,* and credited to them as cash, and the day when said forgery was discovered, communicated to said bank, they, the said *Weld and Jenks,* relying upon said credit, and in ignorance of said forgery, had drawn out all the money which they had in that bank, including the amount credited to them in said certificate of deposite, except the sum of $57.77, then the plaintiff is not entitled to recover any larger sum that the said sum of $57.77, with interest thereon, if the jury shall find interest to be due under the circumstances of this case.

5. The defendant further prays the court to instruct the jury, that if they find the facts stated in the first and second, and

third prayers of the defendant, and if they further find, that on and before the 23rd of November 1839, it was the usage and custom of plaintiff and defendant, for either plaintiff or defendant, to send in to the other on the morning of every day by its runner, the notes, checks and other instruments received by it on the previous day, on which it claimed credit from the other, and to receive in exchange, from the proper officer of the other bank, the notes, checks and other instruments received by the other bank on the previous day, on which it claimed credit from the bank so sending; and if they shall further find, that when the officers of said banks met to make the exchanges as aforesaid, it was the usage and custom for them to deduct the amount claimed by one bank from the amount claimed by the other, and for the officer of the bank, against whom the balance appeared, to enter said balance to the debit of said bank, and that it was not the business or duty of said runners to examine or decide upon the notes, checks and instruments on which credit was so claimed, but that the runner of the bank so sending, returned to the paying teller of his bank, the notes, checks and instruments on which the other bank claimed credit, with any entries which had been made by the officer of the other bank, and that it was the business and duty of the paying teller to examine the said entries, and also the check list furnished by the other bank, and the checks, notes and other instruments on which it claimed credit, and if he objected to allow the credit as claimed, to send back to the other bank, on the morning of the same day, and before 11 o'clock, A. M., the instrument which it objected to receive; and if the jury shall further find, as a part of the usage and custom of said banks, that where credit was improperly claimed on an instrument, and that instrument was sent back to the bank so claiming credit on it: the mode adopted for settling the accounts was for the bank which sent in an improper claim to pay over the amount to the other, on the re-delivery of the instrument, in order not to disturb the account as handed in, and by an alteration of recorded accounts; and if the jury shall further find, that on the morning of 23rd November 1839, the exchange between said banks was made in accordance with the usage of

16     v.3

said banks, and that among the instruments on which the Marine Bank claimed credit, was the certificate of deposite given in evidence in this cause, which was handed to the paying teller of the *Merchants Bank,* *Mr. Gill,* together with the other instruments on which the *Marine Bank* claimed credit; that *Mr. Gill* immediately on seeing said certificate, and before 11 o'clock of that day, objected to allow the credit claimed for it, and sent it back to *Mr. Dorsey,* the runner of the *Merchants Bank,* with the message that he could not receive it; that *Mr. Dorsey* carried said certificate to the teller of the *Marine Bank* and demanded payment for it, but received for answer from said teller, that *Mr. Sprigg* had told *Mr. Littig* or *Mr. Smith* that it might be returned in the check list to the *Merchants Bank;* that *Mr. Dorsey* returned again to *Mr. Gill* with the certificate, handed it to him, and told him what *Mr. Miller* had said respecting the understanding between *Mr. Sprigg* and *Mr. Littig,* or *Mr. Smith;* that *Mr. Gill* gave the certificate back to *Mr. Dorsey,* told him to tell *Mr. Miller* that the *Marine Bank* must pay it, and that *Mr. Sprigg* could settle it with the *Marine Bank* himself; that *Mr. Dorsey* accordingly returned the certificate to *Mr. Miller,* and obtained the amount for which he had objected to allow credit as aforesaid, for the purpose of adjusting the account according to custom, then the plaintiff is not entitled to recover, although the jury may find, that on receiving said money, *Mr. Dorsey* promised that it should be settled on that day.

Rejected by the court, because it takes no notice of the fact as to the time when the *Marine Bank* engaged to pay the amount to the brother-in-law, &c.

6. The defendant further prays the court to instruct the jury, that if they find the facts stated in the preceding first, second, third and fifth prayers, said facts do not amount to a payment to the *Marine Bank* by the *Merchants Bank,* of said certificate.

7. The defendant further prays the court to instruct the jury, that if they find the facts stated in the preceding first, second, third and fifth prayers, the promise made by *Mr. Dorsey,* and the promise or declaration made by *Mr. Sprigg,* if believed by

the jury, was without consideration, and not binding on the *Merchants Bank*.

But the court, (LE GRAND, J.,) refused to grant the defendants said prayers, and each of them. To which refusal of the court to grant its said several prayers, and each of them, and to the opinion of the court overruling the defendant's objection to the admissibility of the statement of facts offered as evidence in this cause by the plaintiffs, and to the opinion of the court expressed in the reasons, and each of them, assigned by the court for its rejection of the first, second and fifth prayers of the defendants, and appended by the court to said prayers respectively; the defendant excepted.

It was agreed, that the printed by-laws of the defendant should be read in the Court of Appeals as if they had constituted part of the record.

The defendants appealed to this court.

The cause was argued before ARCHER, C J., SPENCE and MARTIN, J.

By BRUNE and BROWN for the appellants, who cited:
*Baily on Bills*, 318. *Solomons vs. The Bank of England*, 13 *East*, 136. *Fulton Bank vs. Phœnix Bank*, 1 *Hall*, 573, 576, 578. *Story on Agency*, 34, 104, 105. *Bosanquet vs. Dudman*, 2 *E. Com. Law R.*, 267. *Newson, ad'r vs. Douglass*, 7 *H. & J.*, 453. *Karthaus vs. Owings*, 2 *G. & John.*, 430. *Levy vs. Bank U. S.*, 1 *Binny*, 37· *Bank of the U. S. vs. Dunn*, 6 *Peters*, 59. *Bank of the U. S. vs. Jones*, 8 *Peters*, 16, 17. *Ang. and Ams. on Corp.*, 245, 246. *Key vs. Knott and wife*, 9 *G. & J.*, 342. 1 *Ste. N. P.*, 240. 43 *Law. Lib.*, 417. *Mahoney vs. Ashton*, 4 *H. and McH'y*, 322. *Sowerwein vs. Jones*, 7 *G. & J*, 340, 341.

By S. T. WALLIS and DAVID STEWART for the Appellees, who cited:
*Greenlf. Evid.*, 186, 218 *Fulton Bank vs. Phœnix Bank*, 1 *Hall*, 572. *Talbott vs. Bank of Rochester*, 1 *Hall*, 297. *Wild vs. Bank of Passamaquoddy*, 3 *Mason*, 505, 506. *Fleckner vs. Bank U. S.*, 8 *Wheat*, 358. *Blake vs. Doherty*, 5 *Wheat*, 366. *Bank of Columbia vs. Patterson*, 7 *Cranch*,

299. *Smith vs. Mercer*, 6 *Taunton*, 80. 10 *E. C. Law*, 143. *De La Chaumette vs. The Bank of England*, 17 *E. C. Law*, 356. *Chitty on Bills*, 430, 432. *Sto. on Bills*, 104. *Sto. on Notes*, 465. 1 *Hill*, 287.

SPENCE, J., delivered the opinion of this court.

"At the trial of this case, the plaintiff, to maintain the issue on its part, offered to read in evidence to the jury the statement of facts agreed upon by the counsel of the parties, and submitted to the court upon the previous trial of the cause, to the admissibility of which, as evidence in this trial, the defendant objected; but the court over-ruled the objection, and permitted the said statement to be read in evidence to the jury by the plaintiffs, to which the defendant excepted."

This judgment of the court is first for our revision in this case.

We know of no legal objection to this statement of facts going in evidence to the jury, as the admissions of the parties of the facts therein set forth. The case of *Van Wart vs. Wolley and others*, 21 *Eng. Com. Law Rep.*, 366, is so entirely analogous as not to be distinguished upon principle.

The Court of Appeals, on the former trial of this cause, decided, "that if the case stated showed that the appellee, the *Merchants Bank*, was a *bona fide* holder of the certificate for value paid, the appellant, the *Marine Bank*, would not have been entitled to recover."

The county court were right in rejecting the first, second, third, fourth and fifth prayers on the grounds assigned in the opinion of the Court of Appeals, namely, that to enable the *Merchants Bank* to prevent the *Marine Bank* from recovering, it must shew itself to be a *bona fide* holder for value of the certificate. It is true, that the hypothesis of the third, fourth, and fifth prayers, each of them, present the fact, that on the 19th day of November 1839, *Weld* and *Jenks* had drawn out of the *Merchants Bank* all the money which stood to their credit, with the exception of $57.77; but it is equally true, that there was evidence to the jury, that on the 22nd day of November 1839, the day on which the forgery was discovered, and the

demand made on the *Merchants Bank* to refund the money, there was standing to the credit of *Weld* and *Jenks*, on the books of the *Merchants Bank*, a balance of $6696.03.

It could not be successfully contended, that if at the time this forgery was discovered, and the demand made on the *Mer. chants Bank* to refund to the *Marine Bank* the amount paid on the certificate, *Weld* and *Jenks* had withdrawn from the *Merchants Bank* the balance standing to their credit; that the *Merchants Bank* would not then have been holders of the certificate *bona fide*, and for value. *Fulton Bank vs. Phœnix Bank*, 1 *Hall's Rep.*, 573. But, if *Weld* and *Jenks* had received credit on the books of the *Merchants Bank* for the amount of the certificate, that entry was not conclusive upon the *Merchants Bank*, they were not concluded thereby from correcting their account when the forgery was discovered, on the 22nd November 1839, if they had funds of *Weld* and *Jenks'* in their possession, adequate to that purpose. It was, as it stood, evidence *prima facie* against the *Merchants Bank*, but not conclusive. *Garland vs. Salem Bank*, 9 *Mass. Rep.*, 408.

The county court erred in rejecting the defendant's sixth prayer, as there was no evidence in the cause, of the payment by the *Merchants Bank* to the *Marine Bank* of the certificate.

We are also of opinion, that the county court erred in refusing the defendant's seventh prayer.

"The cashier of a bank, possessing no incidental authority to make any declarations binding the bank, not within the scope of his ordinary duties: so if the cashier of a bank should promise to pay a debt which the corporation did not owe, and was not liable to pay, or should admit forged bills of the bank to be genuine, the bank would not be bound by such promise or admission, unless it had authorized or adopted the act." *Storey's Com. on Agency, page* 104, *sec.* 115 *and Gloucester Bank vs. Salem Bank*, 17*th Mass. Rep.*, 1.

From the view which we have taken of the opinion given by the Court of Appeals, on the former trial of this cause, we are of the opinion, that the *Merchants Bank* cannot, in this

case, successfully resist the recovery by the *Marine Bank*, and therefore affirm the judgment.

ARCHER, C. J., delivered the following dissenting opinion:

I am of opinion there ought to be a *procedendo* in this case. If the *Merchants Bank* was entitled to retain the money which was paid to it on the forged certificate, by the *Marine Bank*, provided the *Merchants Bank* could show, that she was a *bona fide* holder, and for a valuable consideration, I cannot conceive upon what principle she can be precluded from reposing on the title of the *Alton House*, which according to the proof, was a fair and *bona fide* holder for a valuable consideration, and when the subsequent holders were either acting as agents in the collection, or were *bona fide* holders for a valuable consideration, having no notice whatever of the forgery, or of any fact that could put them upon the enquiry.

It is my opinion that the Court of Appeals never meant to decide any proposition opposed to these views, and I account for the peculiar phraseology of the court's opinion when the case was in this court before, from the fact, that in the case then stated, the *Merchants Bank* neither set up, or offered to set up the title of the *Alton House*, the *New York House*, or the title of *Weld and Jenks*, but rested solely on her own title.

The money, when received by the *Merchants Bank* was, in my judgment, received for the benefit of the *bona fide* holder for a valuable consideration of this certificate, and that she bore the character of agent in the transaction, an agency merely of collection, and to deny the *Merchants Bank* the legal right to retain the money is in effect to say, that nò matter in what condition, or under what circumstances the forged draft was taken; such holder, if he endorses the draft, even for collection, shall lose the money, although the same shall have been paid on presentation.

JUDGMENT AFFIRMED.