COMMONWEALTH, by Commissioners of Savings Banks, *vs.* READING SAVINGS BANK. William J. Holden & another, receivers, petitioners.

Suffolk. March 15, 1881. — May 15, 1882.

The by-laws of a savings bank, incorporated subject to the general laws of this Commonwealth relating to savings banks, made it the duty of the treasurer to enter deposits and payments in the books of the bank, and a duplicate of each entry in the book of a depositor; gave him charge of the books of account; and contained the following clause: "He shall draw all necessary papers and discharge all obligations of the corporation; and his signature shall be binding on the corporation." The treasurer, in some instances, borrowed money, representing that it was for the benefit of the bank, and gave his individual notes therefor, and, as collateral security for the notes, deposit-books of the bank, originally genuine and issued to himself or others, which showed certain sums to be still due from the bank, but which the bank had in fact paid to the original depositor in full; or gave as security books which contained entries in whole or

in part fictitious. Some of the books which were originally genuine contained assignments purporting to be signed by the depositors, but their signatures were either forgeries, or were procured by the fraud of the treasurer to assignments in blank, on his representations that the assignments were receipts. In other instances, third persons obtained money on such deposit-books, the treasurer fraudulently stating in writing over his signature, or orally, that the books were genuine, and that the bank owed the money to the persons appearing as assignors of the books. The persons lending the money acted in good faith; but none of the transactions appeared on the books of the bank, or were authorized by its trustees; and none of the money came into its possession. *Held,* that none of the acts of the treasurer were binding upon the bank, although it was the practice of savings banks in this Commonwealth to recognize in some form on their books assignments of deposit-books and the rights of the assignees.

UPON an application made by the commissioners of savings banks, under the St. of 1866, *c.* 192, § 5, the Reading Savings Bank had been enjoined from the further continuance of its business, and receivers had been appointed to take possession of its property and effects, for the purpose of settling its affairs.

The receivers filed a petition in the case, alleging that certain persons and corporations named had presented claims, to the amount of $24,900, against the bank, by virtue of certain deposit-books, purporting to be issued by the bank, and to be held by said persons and corporations by assignment; that there was no evidence upon the books of the bank, that any sum was due upon any of the claims; and praying that all said persons and corporations be ordered to appear and submit their claims to be determined in such manner as the court might order.

The court referred the petition to a special master, to hear the parties, and ascertain and report to the court the facts with regard to each claim.

On the coming in of the master's report, the case was reserved by *Colt,* J., upon said report, for the consideration of the full court. The facts appear in the opinion.

*S. Bancroft,* for the receivers.

*A. Russ & W. G. A. Pattee,* for the Faneuil Hall National Bank and the Monument National Bank.

*E. Hutchinson,* for the First National Bank of Chelsea.

*D. C. Linscott,* for the Metropolitan National Bank.

*F. T. Greenhalge,* for the Appleton National Bank of Lowell, Gyles Merrill and George T. Sheldon.

*C. H. Fiske,* for the Collateral Loan Company.

DEVENS, J. The record in this case discloses a series of various and extensive frauds, practised by the treasurer of the defendant corporation and others, sometimes aided by him, upon innocent parties, who were induced to part with their money upon his oral statements and upon the collateral security of alleged bank-books, forged or fictitious, or on which nothing was due. The holders of these books contend that the bank is responsible for the wrongful acts of its treasurer, and must treat these books as valid securities. The bank has derived no advantage from these transactions, and no portion of the money thus fraudulently obtained has found its way into its vaults or been expended for its use. The transactions proved were not shown by the official books of the treasurer, and were not authorized by any vote of the trustees. The liability of the bank is to be determined by ascertaining its responsibility for the acts of the treasurer by reason of the official relation he bore to it.

In some instances, money was borrowed by him, under the pretence that it was wanted for the bank, but in his own name, on the security of deposit-books originally genuine, issued to himself or others, the loans on which had been fully paid, but on which payment had not, by reason of his own fraud, been entered. When the books were originally payable to others, forged signatures to drafts for the money apparently due, and assignments of the books, were sometimes made ; while sometimes, at the time of payment of the sums due from the bank, the depositor had been induced to sign his name to the draft (which was in blank on the deposit-book) and across the same as a receipt, which was afterwards fraudulently filled up as a draft and assignment by him. In some instances, books were used which were either entirely fictitious, or in which false entries had been made, so that they showed more to be due than was ever actually due from the bank. The assignments of books of this description as collateral security were recognized by the treasurer and assented to by indorsement thereon. In still other instances, loans were obtained by parties other than the treasurer upon books of the character above described, to the forged or pretended assignments of which the treasurer assented by his indorsement. Oral statements were also made by the treasurer as to these books, used both in

the loans made to him and to others, that they were all right, and that they showed what was due.

The Reading Savings Bank was incorporated on June 12, 1869, by the St. of 1869, *c.* 393, with all the powers and privileges, and subject to all the duties, liabilities and restrictions, then or which might thereafter be in force in relation to institutions for savings. A savings bank in this Commonwealth is an institution formed for the purpose of receiving deposits of money for the benefit of the depositors investing the same, accumulating the profit or interest thereof, paying such profit or interest to the depositor, or retaining the same for his greater security, and further of returning the deposit itself. The regulations as to the payments of interest and return of deposit are prescribed partly by statute and partly by the institution itself. There is no capital stock, and there are no stockholders who are entitled to receive profits from the business. All these belong to the depositors, and nothing is deducted therefrom except the necessary expenses of transacting the business. Its affairs are administered by a board of trustees, the securities in which the deposits shall be invested are prescribed by law, and returns are made to commissioners of savings banks, who may examine the institution at any time, so that the conduct of its affairs may be constantly under public supervision. Although termed a bank, it has few characteristics of a commercial bank of discount and deposit, a large part of whose business consists in dealing in exchange and negotiable paper for the benefit of its stockholders, and to which, when done by its proper officers, the rules of such dealing are applicable. It affords a convenient mode of taking care of sums individually small, (as only deposits to a limited amount are permitted,) but often large in the aggregate, and its purpose is a public advantage without any interest in the members of the corporation. *Huntington* v. *Savings Bank*, 96 U. S. 388. The character of the corporation cannot exonerate it from the legal responsibilities involved in the business which it was created to transact, and it must be liable for the acts of its officers done in the regular performance of their duties. *Reed* v. *Home Savings Bank*, 130 Mass. 443. But its character is of importance in deciding what the duties of its officers are, and in determining whether the acts done by them were in the performance of such

duties. Its officers cannot assume responsibilities or enter into transactions or contracts, express or implied, so as to involve the bank, unless such acts are clearly incidental to the duties imposed upon them.

The by-laws of the bank made it the duty of the treasurer "to enter all deposits and payments made to depositors in the books of the bank, and a duplicate of such entry in the book of the depositor, which shall be his voucher, and the evidence of the amount deposited;" to lay before the board of managers at specified times a statement of the concerns of the institution; to have charge of all books of accounts, moneys, papers and other securities, and property, and to be responsible for their safe keeping. It is further added, "He shall draw all necessary papers and discharge all obligations of the corporation, and his signature shall be binding on the corporation." He is also to pay the current bills of the corporation, not exceeding the appropriation previously made, and to keep a complete record of vouchers for all his payments for exhibition to any member of the board of trustees.

These by-laws do not show any intention to make the treasurer a general agent to bind the bank in the administration of its affairs, or to hold him out as one authorized to pledge its credit; nor can it be inferred that he has any such right by virtue of his office. In *Dedham Institution for Savings* v. *Slack*, 6 Cush. 408, it was held that the treasurer of a savings bank had not authority to release a debt due, upon payment of a dividend thereon. In *Bradlee* v. *Warren Savings Bank*, 127 Mass. 107, it was held that he could not bind the bank by indorsing its name upon a promissory note, although in that case the bank had received the proceeds, and, further, that the provision that "his signature shall be binding upon the corporation," in a clause like that heretofore quoted, meant his signature to necessary papers, and in discharge of obligations to the corporation, and gave no authority to indorse.

The frauds committed in connection with the claims before us were perpetrated principally by the assertion by the treasurer, in various forms, that the bank was owing sums which it did not owe, in support of which fraudulent and fictitious bank-books were exhibited, assented to or recognized by him, upon

assignment whereof the claimants parted with their money. It appears that it is and has been the practice of savings banks in this Commonwealth to recognize assignments of the deposit-books of such banks, and the rights of the assignees therein, by an entry in some form on the books kept by such banks; that this was the practice of the Reading Savings Bank; and that national banks (who are included among the claimants) have been in the habit of lending money, taking such deposit-books as collateral security.

A transfer of a deposit may be shown by a delivery of the bank-book to the grantee, accompanied by an assignment thereof. As there can be no manual delivery of the credit which the depositor has with the bank, the delivery of the book, which represents the deposit and is the only evidence of the contract, together with the assignment, operates as a transfer of the existing fund, and is all the delivery of which the subject is capable. *Pierce* v. *Boston Five Cents Savings Bank,* 129 Mass. 425. That, as between the depositor and the bank, it may be shown that an entry in a pass-book is an error, and that the depositor is not entitled to receive the sum stated, or that it has been paid, or that it has been taken from the bank by legal process, can hardly be controverted. If a cashier of a bank of discount should promise to pay a debt that the corporation did not owe, or should admit bills forged upon it to be genuine, the bank would not be bound by such promise or admission. *Salem Bank* v. *Gloucester Bank,* 17 Mass. 1, 29. *Cocheco National Bank* v. *Haskell,* 51 N. H. 116. *Merchants' Bank* v. *Marine Bank,* 3 Gill, 96. Story on Agency, § 115. Where one receives credit on his pass-book for a check found afterwards not to be good, the entry may be cancelled. *National Gold Bank & Trust Co.* v. *McDonald,* 51 Cal. 64. The maker of a certificate of deposit may overcome its effect by satisfactory proof that it is wrong. *Lacon National Bank* v. *Myers,* 83 Ill. 507. The entry, on the books of a bank, of a credit, is *prima facie,* and not conclusive, evidence. *Garland* v. *Salem Bank,* 9 Mass. 408. *Merchants' Bank* v. *Marine Bank, ubi supra.* Where also the deposit ledger of a bank and a depositor's pass-book both showed a deposit (which was proved to have been erroneously entered), and the money was paid thereon, it was held that it might be recovered

back as paid under mistake of fact. *McLean County Bank* v. *Mitchell*, 88 Ill. 52.

Unless there is a duty to third persons imposed on the treasurer by virtue of his office to state what the condition of a person's account is, so as to enable another to purchase the book or to lend money upon it as collateral security, a savings bank cannot be responsible for the frauds which are committed by means of forged, fictitious or paid-up books, to which the treasurer has given currency by statements that they accurately represent the sums due, by assenting to assignments thereof, or in other ways.

Without deciding what responsibility might be incurred by a commercial bank for the acts of its cashier, it is sufficient to say that the treasurer of a savings bank is an officer of much more limited powers. The cashier is the financial officer of the bank, through whom and by whom all its money operations are conducted, not only in paying or receiving debts but also ordinarily in discharging or transferring securities, and who may also certify deposits, or, when necessary for its transfer, indorse negotiable paper. *Matthews* v. *Massachusetts National Bank*, 1 Holmes, 396. The duties of the treasurer more nearly resemble those of the paying and receiving tellers of banks. Even where the acts of a cashier, within the scope of the general usage, practice and course of business, might bind the bank in favor of third persons, the guaranty or recognition by such officers of a liability has no such effect. A teller of a bank as such, it is held in *Mussey* v. *Eagle Bank*, 9 Met. 306, has no authority to certify a check as good so as to bind the bank to pay the amount thereof to any person who may afterwards present it; and a usage for him so to certify a check, to enable the holder to use it at his pleasure, is bad. A statement by a bank teller that an indorsement is genuine, does not bind the bank. *Walker* v. *St. Louis National Bank*, 5 Mo. App. 214. The books of a depositor are, it is said in *Pierce* v. *Boston Five Cents Savings Bank*, *ubi supra*, something more than mere statements of account, and partake of the nature of money securities. But, while this is so, they are open to all defences, in the hands of the depositor himself, which will show that there is nothing due on them; and they have no elements of negotiability by which additional value may be

imparted to them in the hands of third persons. As the bank is not responsible to any one to whom the treasurer has given a false, fictitious, or even erroneous credit, so it is not responsible to any one to whom such credit is transferred. The assignment can only operate, even if assented to by the treasurer, to convey the rights, if any, which the depositor has. The duty of the treasurer is to receive the deposits and to pay to those entitled thereto, and he can recognize assignments no further than as they are of sums actually due. While it may add to the negotiability of these books to make the bank responsible for the certification of the treasurer as to their correctness, no duty thus to certify is imposed upon him. Nor can it be inferred, as against the bank, that he has such authority from the use that has been made of these books in effecting loans. As it is no part of his duty to undertake to give a market value to, or obtain a market for, the negotiable paper of others, by indorsing it on behalf of the bank, so it is no part of his duty to complicate the simple contract which the bank makes with its depositors by other contracts, involving serious responsibility to third persons, entirely foreign and unnecessary to its legitimate objects.

Assignments and transfers of savings-bank books and accounts are made for the convenience of those who are parties to them, and there is no reason why the assignees should have higher rights than their assignors. Such transactions are of no benefit to the bank; and, in all that is done in reference to them, the treasurer is rather the agent of the parties than of the bank. It is no part of his duty, as treasurer, to state, for the benefit of others, what is due depositors, and the bank should not be made responsible for any failure on his part to make a correct statement. He has no more right to bind the bank to pay to a third person an account on which nothing is due, than he has to bind it to pay a depositor or pretended depositor what is not due.

We have dealt with the question as to the effect of a transfer of an account, which is erroneous, paid up or fictitious, by the person in whose favor it apparently exists with the bank. It is to be observed that in most of these claims either the draft or the assignment, and in some instances both the draft and the assignment, of the pretended accounts are forged. These forgeries are of three kinds: where the accounts were wholly fictitious,

and had been prepared in the name of fictitious persons, and the signatures were made in their names; where the accounts were originally genuine, but had been paid and not cancelled, or additional entries were made of sums pretended to be due, and the signatures of the persons in whose favor the accounts had once existed were forged; and where, in cases similar to those last stated, the person, in whose favor the genuine account had once existed, had been induced to place his name upon it as a receipt, and afterwards a draft or assignment had been fraudulently forged above it. If similar transfers were forged of accounts on which moneys were actually due, the bank would not be liable to the holders of the forged transfers. The fact that the accounts are merely pretended, and that nothing is due, cannot make a title to the claimants by means of these forgeries which shall enable them to assert, as against the bank, that the claims are good. This would be to make the bank liable for forgeries of the names of third persons committed by its treasurer in matters in which he had as such no concern. With the making of drafts and assignments for depositors he certainly had no proper connection.

We proceed to consider very briefly the several claims as reported. All do not require the application of the principles we have been discussing, as they could be disposed of on other well-settled grounds. But all are included within them, and, if those principles are correct, may safely be decided by them.

In the claim of the Faneuil Hall National Bank, money was borrowed by Pratt, the treasurer, on the statement that it was for himself, on his promissory note and the security of two bank-books of other persons, which he held, as he stated, as investments. After the original loan was made, some change was made in its amount and the securities, but the Faneuil Hall Bank now holds, as security for its loan, three pass-books; one payable to Pratt himself, which had been fully paid long before its transfer to the claimant. The other two are books once genuine, on which nothing was due when transferred, they having been previously fully paid; no entry of the payment having been made in one, while, in the other, fictitious entries had been made showing more to be due than actually had ever been due. On both these last books, the signatures which purported to

assign them were forgeries, as well as those to the drafts. Pratt promised to make the proper entries in the books of the Reading Savings Bank to show the assignments, but never did so, and afterwards said he had done so. That the acts and declarations of Pratt amounted to a direct representation that these books were proper vouchers, is clear. But unless we are prepared to hold that it is in the power of the treasurer, by means of a book representing a sum to be due from a savings bank which is not due, to make the bank responsible to one who honestly receives it as collateral security, there can be no claim on the book made in the name of Pratt himself. The question as to the other books has the additional element that the drafts and assignments which purported to transfer them were forgeries. We have already stated our reasons why no such transactions, even though the active agent in them was its treasurer, should be allowed to establish a liability against this corporation.

The claims of the Monument National Bank, the First National Bank of Chelsea, and Gyles Merrill, like that of the Faneuil Hall Bank, are cases in which the loan was made to Pratt, sometimes upon the statement that money was wanted for the bank; but they all are loans which were procured by means of books on which nothing was due, and on which forgery was necessary for their pretended transfer. They are governed by the same principles as those we have applied in the claim of the Faneuil Hall Bank.

In certain of the remaining claims, while the treasurer did not himself effect the loan, he participated in the fraudulent transaction at the time the loan was made; in others, after the transaction, he recognized the fictitious account that had been used; and in one he had apparently no agency, the fraud being effected by the use of his name by his son, which it is found wherever it was used to have been a forgery by the son. In all cases, the instruments and agencies by which the frauds were effected were forged assignments and fictitious securities, such as we have heretofore considered. They do not require a separate examination to ascertain if in them, or some of them, there are not other reasons why the Reading Savings Bank should not be held liable. They cannot be distinguished in favor of the claimants, certainly, from those already discussed.          *Claims disallowed.*