COMMONWEALTH, by Commissioners of Savings Banks, *vs.* READING SAVINGS BANK.   Arthur W. Austin, petitioner.

Suffolk.   Nov. 21, 1883. — July 10, 1884.   C. ALLEN & HOLMES, JJ., absent.

The by-laws of a savings bank, incorporated subject to the general laws of this Commonwealth relating to savings banks, provided for the appointment of a board of trustees, (which by statute was required to meet at least once in three months,) and for the appointment of the same person as secretary and treasurer.  The by-laws also made it the duty of the secretary to keep a record of all meetings of the board of trustees in a book belonging to the corporation, and provided that "such record shall be held in proof of the votes and transactions of the corporation."  The treasurer of the bank assigned to A. a mortgage belonging to the bank for its full value, exhibiting at the time to A., who acted in good faith, a copy, certified by himself as secretary, of what purported to be a vote of the trustees authorizing the treasurer to "discharge, assign, and release all mortgages belonging to the bank."  The trustees had passed a vote authorizing the treasurer to discharge and release mortgages, and the word "assign" had been fraudulently interpolated in the record.  The treasurer appropriated the money received from A. to his own use.  On a bill in equity brought by A. against the receivers of the bank, it did not appear whether the interpolation was made by the treasurer, nor whether it was made before or after the certificate of the vote was shown to A.  *Held,* that the defendants were estopped to deny the validity of the assignment.

If the trustees of a savings bank pass a vote authorizing the treasurer of the bank to assign mortgages held by the bank, such vote is not *ultra vires* as to a person who, in good faith and for a valuable consideration, takes an assignment of a mortgage from the treasurer.

If the treasurer of a savings bank makes an absolute assignment of a mortgage belonging to the bank to a person who pays full value for it, who agrees to re-sell it to the bank if the bank subsequently wishes to buy it, such a transaction is a sale of the mortgage, and not a pledge or an equitable mortgage of it; and the fact that the treasurer afterwards pays interest on the mortgage to the assignee does not show an agreement by the bank to treat the transaction as a loan.

An assignment of a mortgage held by an incorporated savings bank purported to be the deed of the bank, and to assign "the mortgage deed, the real estate thereby conveyed, and the note and claim thereby secured."  It was signed in the name of the bank by A. B., treasurer.  The *in testimonium* clause read, "In witness whereof, I, A. B., treasurer of said corporation, have hereunto set my hand and seal."  The promissory note which the mortgage was given to secure was indorsed, "A. B., treasurer."  *Held,* that, if the assignment was so defectively executed as not to transfer the mortgage and land, the note and claim thereby secured passed, and that a court of equity would correct the assignment, and treat the mortgage as transferred with the debt.

If the treasurer of a savings bank assigns a mortgage of land, belonging to the bank, exhibiting at the time to the assignee a copy of a vote of the trustees of the bank, certified by him as secretary, which gives him authority to assign mortgages, and also represents that the mortgage is a first mortgage, although the bank is estopped, as against the assignee, to deny the fact that such a vote was passed, it is not estopped to show that it holds a prior mortgage on the land.

UPON an application made by the commissioners of savings banks, under the St. of 1866, *c.* 192, § 5, the Reading Savings Bank had been enjoined from the further continuance of its business, and receivers had been appointed to take possession of its property and effects, for the purpose of settling its affairs.

On February 17, 1882, Arthur W. Austin filed a petition in the case, alleging the following facts:

On November 29, 1871, one David F. Weston conveyed in mortgage certain land in Reading to the Reading Savings Bank, by a deed in the usual form of a power of sale mortgage, and containing a covenant that the grantor was lawfully seised in fee simple of the granted premises, and that they were free from all incumbrances. This deed was drawn and witnessed by, and acknowledged before, C. P. Judd, who was at that time a trustee of said bank. The consideration expressed in the deed was $5000, and it was given to secure a promissory note of that amount.

On May 14, 1878, the bank, by its treasurer, Nathan P. Pratt, assigned the mortgage and note and debt to the petitioner, and received, as consideration for the same, the principal and interest then due. The interest on said note was paid to the petitioner to November 1, 1878, by said bank, and no longer. On April 30, 1879, the petitioner took quiet, peaceable, und unopposed possession of said land for the purpose of foreclosing said mortgage, on account of a breach of condition therein contained, namely, the non-payment of principal and interest, and on May 5, 1879, the receivers of the bank took possession of the land, claiming so to do by virtue of a mortgage for $1550 on the land, alleged to have been given by Weston to the bank, dated May 16, 1870. The assignment to the petitioner was made with the full assurance of the treasurer of the bank that there was no prior incumbrance.

The prayer of the petition was that the mortgage of $1550 be declared not to take precedence of the petitioner's mortgage; and, if it did take precedence, that the petitioner be allowed to redeem the same.

On April 11, 1882, the petitioner filed a supplemental petition, alleging that on or about May 14, 1878, Nathan P. Pratt, the treasurer of the Reading Savings Bank, applied to the

petitioner to purchase and take a transfer of the $5000 mortgage given by Weston, and of the note secured thereby, and showed to the petitioner, at his request, a vote of the trustees of the bank, authorizing the treasurer to discharge, assign, and release all mortgages belonging to the bank; that thereupon it was agreed between the petitioner and Pratt, as treasurer, that the bank should execute and deliver an assignment of said mortgage deed, and transfer said note to the petitioner, upon payment by him to the bank of a sum equal to the principal and interest then due on the note; that the petitioner paid said sum to the bank, and the bank executed and delivered to the petitioner an assignment, and a transfer of the note; and that it appeared that the execution of the assignment was of doubtful validity, and might be insufficient to pass the legal title to the land.

The prayer of this petition was, that the receivers be ordered to reform the assignment, by executing and delivering to the petitioner a sufficient assignment; and for further relief.

Annexed to this petition were copies of the assignment, and of the mortgage note, as follows:

" Know all men by these presents, that the Reading Savings Bank, a corporation under the laws of Massachusetts, and the owner of a certain mortgage given by David F. Weston to said Reading Savings Bank, said mortgage dated November twenty-ninth, A. D. 1871, and recorded with Middlesex South District Deeds, libro 1189, folio 136, in consideration of five thousand dollars paid by Arthur W. Austin, of Milton, county of Norfolk, esquire, the receipt whereof is hereby acknowledged, do hereby assign, transfer, and set over unto the said Arthur W. Austin the said mortgage deed, the real estate thereby conveyed, and the note and claim thereby secured.

" To have and to hold the same to the said Austin and his heirs and assigns, to their own use and behoof forever; subject, nevertheless, to the conditions therein contained, and to redemption according to law.

" In witness whereof, I, Nathan P. Pratt, treasurer of said corporation, by vote duly authorized, hereto set my hand and seal this fourteenth day of May, A. D. 1878.

" Reading Savings Bank,     [seal]<br>
by N. P. Pratt, Treasurer."

This assignment purported to be acknowledged before a justice of the peace, on May 14, 1878, by "Nathan P. Pratt, treasurer, in his official capacity," as "his free act and deed," and to be recorded on March 25, 1879.

"$5000.                              Reading, November 29, 1871.

For value received, on demand, I promise to pay to the order of the Reading Savings Bank, a corporation, five thousand dollars, with interest at the rate of seven and three tenths per cent per annum, payable semiannually until said principal is paid.

                                   "David F. Weston.

"Attest: C. P. Judd.

"Secured by a mortgage duly stamped."

On the back of the note was written: "Without recourse to Reading Savings Bank.   N. P. Pratt, Treasurer."

The receivers appeared and filed an answer, admitting the making of both the mortgages by Weston to the bank; and alleging that said mortgages were the property of the bank and of the receivers.   They admitted that they had taken possession under the first mortgage, and for the purposes alleged in the petition, and that they intended to apply the rents and profits to the last mortgage or other indebtedness of Weston to the bank.   They alleged that the first mortgage was a valid and outstanding security, and that the debt secured thereby had in no part been paid.   They denied that Pratt had any power or authority vested in him to sell or assign said mortgage or said note; but alleged that whatever was done by Pratt was done without the knowledge or consent of the trustees or board of investment of the bank, and that no money received by Pratt from the petitioner ever came into the possession of the bank, and that no title or right came to the petitioner by reason of any acts of Pratt done in the premises; and that all his acts were unlawfully and fraudulently done for the purpose of defrauding the bank; and prayed that the petitioner be ordered to reassign said mortgage to them, to be held by them in their capacity as receivers.

The case was heard by *W. Allen*, J., who found the following facts:

The Reading Savings Bank was incorporated by the St. of 1869, c. 393, "with all the powers and privileges, and subject to.

all the duties, liabilities, and restrictions, set forth in all general laws which now are or may hereafter be in force in this Commonwealth, relating to institutions for savings."

The by-laws of the bank provided that the officers of the corporation should be a president, a vice-president, a treasurer who should also be the secretary, and a board of trustees thirteen in number; and that there should be a board of investment consisting of three persons. The duties of the secretary and treasurer, prescribed by the by-laws, were as follows:

" It shall be the duty of the secretary to notify all meetings of the corporation, or of the board of officers, either by written, printed, or personal notices. He shall keep a full, complete, and just record of all meetings of the corporation, or of the board of trustees, in a book belonging to the corporation, and shall at all times submit it to the inspection of members of the board, and such record shall be held in proof of the votes and transactions of the corporation.

" It shall be the duty of the treasurer, with such assistants as he may be authorized by the board of trustees to employ, to attend at the bank during bank hours, to enter all deposits and payments made to depositors in the books of the bank, and a duplicate of such entry in the book of the depositor, which shall be his voucher, and the evidence of the amount deposited. It shall also be his duty to lay before the board of managers, at their semiannual meetings, a statement of the concerns of the institution, which shall be examined and certified by a committee appointed for that purpose at the annual meeting of the corporation. The treasurer shall have charge of all books of accounts, moneys, papers, bonds, mortgages, and other writings of security, and property belonging to the bank, and shall be responsible for their safe keeping. He shall draw all necessary papers, and discharge all obligations of the corporation, and his signature shall be binding upon the corporation. He may pay the current bills of the corporation as they accrue, never exceeding the amount of appropriation previously made by a majority of the board of investment, saving only the expenses necessarily incurred in the commencement of the business of the corporation previous to the adoption of these by-laws. He shall keep a complete record or file of vouchers for all his payments, and

shall exhibit the same at any time to any member of the board
of trustees for his vindication."

Nathan P. Pratt, the secretary and treasurer of the Reading
Savings Bank, offered to sell the $5000 mortgage and note to
the petitioner, saying that the mortgage was a first or a bottom
mortgage, and that it was so good that the bank, which then
expected a panic, would wish to buy it back again, and to this
the petitioner assented; and for that reason the petitioner did
not record the assignment which he took until after the fail-
ure of the bank was known.   Pratt had previously exhibited to
him a paper, a copy of which is printed in the margin,* which
at this time he left with the petitioner, at his request.   Pratt
delivered to the petitioner said mortgage, the assignment and
the note, copies of the last two of which are annexed to the
supplemental petition; and, on being asked as to the seal used
on the assignment, said that the bank had no common seal.
The petitioner paid the principal and interest due on the mort-
gage note, and Pratt paid him the interest next falling due, as
the petitioner understood, for the bank.

In 1873 a vote was passed by the trustees of the bank, au-
thorizing the treasurer to pledge bank stock as collateral secu-
rity, if necessary to borrow money to meet the requirements of
the bank.

All said mortgages and notes, prior to the assignment of the
mortgage to the petitioner, were due and unpaid, and held by
the bank as a part of its assets.   A vote was in fact passed
by the trustees to empower the treasurer to discharge mort-
gages, and was in the terms of the copy shown to the petitioner,
except that the words " and assign " had been interpolated
therein without the knowledge of the trustees, or of any of
them.   This vote was recorded in the book of the records of the
doings of the trustees, without this interlineation, in the hand-
writing of a person other than Pratt, as a part of the records of
the doings of a meeting of said trustees, and the records of that

---

* " At a legal meeting of the trustees of the Reading Savings Bank, held
at the bank building, on the third day of May, 1876, upon motion of C. F.
Judd, Esq., one of said trustees, — Voted, that the treasurer be authorized
to discharge, assign, and release all mortgages belonging to the bank.

" Attest: Nathan P. Pratt, Sect'y."

meeting were attested by Pratt as secretary; and, by an erasure and an interlineation in a handwriting other than that of Pratt, they were made to read as does the copy which was shown to the petitioner. No part of the money received from the petitioner by Pratt ever came to the use of the bank, but forged duplicates of the note and of the mortgage had been made by some one, and placed among the mortgage securities of the bank, which forged note and mortgage were so well executed that the trustees were deceived thereby; and, in their examination of the assets of the bank, they treated, counted, and reported this forged note and mortgage as the original, at their semiannual examination, made after the assignment and delivery of the mortgage by Pratt to the petitioner.

Pratt, at the time of the failure of the bank, was a defaulter to a very large amount. In fact, nearly all the mortgage securities of the bank had been eloigned therefrom, and forged duplicates put in their place, by which the auditing committee of the trustees was deceived, and which were treated by it as originals, as in the case of the mortgage assigned to the petitioner.

After the passage of the St. of 1872, c. 293, § 3, the president and two others of the trustees, neither of the latter being the treasurer, were chosen each year as the board of investment, and at the time of these transactions the president, C. P. Judd, and Hiram Barrus were the board of investment.

On these facts, so far as admissible and material, the judge reported the case, for the consideration of the full court, upon the questions of law arising thereon.

*R. D. Smith*, for the petitioner.

*S. Bancroft*, for the receivers.

DEVENS, J. In the cases which have heretofore been considered arising out of the frauds of Nathan P. Pratt, the treasurer of the Reading Savings Bank, it has been held that he had no right by virtue of his office and its general powers and duties, or by the authority of any recorded vote of the bank or its trustees, which therein appeared, to sell or transfer the securities of the bank. It has been further held, that there was no duty to third persons imposed upon him, by virtue of his office as treasurer, to state what the condition of a depositor's account was, so as to enable them safely to take assignments

or transfers thereof, and therefore, in all that had been done or said of this character, he must be deemed rather to have been the agent of the parties than of the bank, which was not to be held responsible for his false statements. *Commonwealth* v. *Reading Savings Bank*, 133 Mass. 16. *Holden* v. *Upton*, 134 Mass. 177. *Holden* v. *Hoyt*, 134 Mass. 181. *Holden* v. *Phelps*, 135 Mass. 61.

The principal question in the case at bar is whether the exhibition and delivery to the petitioner by Pratt, who was the secretary as well as the treasurer of this institution, of what purported to be a certified copy of a vote of the trustees authorizing the treasurer to discharge, assign, and release all mortgages belonging to the bank, enabled Pratt as treasurer to make to the petitioner, who acted thereon in good faith and paid the full face value of the mortgage, an assignment, the validity of which the bank is estopped to controvert, although in fact no such vote was ever passed by the trustees, (the word "assign" having been fraudulently interpolated into the recorded vote,) and although no part of the payment for the assignment of the mortgage ever came into the assets of the bank.

That the bank is not bound by fraudulent interpolations in its records, as to third persons who have not acted upon or been misled by them, is clear. Even if such interpolations were made by the recording officer, it would not be in his power by acts thus fraudulently done to impose upon it a liability which it had not assumed. *Amherst Bank* v. *Root*, 2 Met. 522. *Holden* v. *Hoyt, ubi supra.* It is obviously a different inquiry whether, when third persons have been deceived by such interpolations, or by certificates, made by the recording officer of such an institution, of votes which have been fraudulently altered, or which it is falsely pretended have been passed, and have in good faith acted thereon, the responsibility to which every institution is subjected by reason of acts done by its officers in the performance of their duties does not estop it from denying the accuracy of the record or of the certificate.

While a savings institution has but few of the characteristics of a commercial bank of discount and deposit, is intended as a convenient method of taking care of sums individually small, and has for its purpose a public advantage without any interest

in the members of the corporation, yet it cannot be exonerated from the legal responsibilities involved in the business which it was created to transact, and must be liable for acts done by its officers in the regular performance of their duties. *Reed* v. *Home Savings Bank*, 130 Mass. 443. *Commonwealth* v. *Reading Savings Bank, ubi supra.*

Whether the interpolation of the word "assign" was made by Pratt himself in the record does not appear; it certainly was made with his concurrence. Nor does it clearly appear that it was made before the certified copy of the vote, upon which the petitioner acted, was exhibited and delivered to him. In the view we take of this case, neither of these circumstances is important. The board of trustees is by statute to meet at least once in three months, and, at each meeting, a record is to be made of the transactions of the board. St. 1876, *c.* 203, § 7. Pub. Sts. *c.* 116, § 18. Of this board, Pratt, as secretary, was the recording officer, and the by-laws of the corporation prescribe that the secretary "shall keep a full, complete, and just record of all meetings of the corporation or of the board of trustees, in a book belonging to the corporation, and shall at all times submit it to the inspection of the members of the board, and such record shall be held in proof of the votes and transactions of the corporation."

The business of this corporation necessarily demanded, not only that there should be a discharge and release of the mortgage securities held by it, as in the ordinary course of business they might be paid, but also that from time to time they be sold and assigned, as other securities should be deemed more suitable for investment, or as the demands made upon the bank by the depositors required that it should be provided with available funds. While its property was in the hands of the trustees, and subject to their control, they could not be expected themselves to conduct all its affairs, on account of the infrequency of their meetings, but it was their duty to provide therefor by giving proper authority and direction. What that authority and direction are, whether relating to the duties of the investing committee or the treasurer, those most cautiously dealing with the bank can only ascertain by examining the record of its transactions, which by law it is compelled to keep,

or by relying on the certificate of its recording officer. To examine the records would often be attended with difficulty to the person proposing to deal with the corporation, as he would be obliged to attend at the banking-house, and with annoyance to the bank itself, as such examination might disclose other transactions, either past or anticipated, which it might prefer not publicly to exhibit. If it be not within the official duty of the secretary to certify the records correctly, and thus entitle third persons to depend on such certificate, it is not easy to see how the ordinary business of such an institution could be conducted. It must be held that confidence is reposed in him by the trustees, not merely correctly to record their votes, but also to inform those entitled to inquire as to the record by proper certificate thereof. It thus follows, that, if false certification be made by him, the injury resulting therefrom must be borne by the corporation, whose officer he is, and that it must be estopped to deny the correctness of the vote as certified.

In *Whiting* v. *Wellington*, 10 Fed. Rep. 810, the question was, in a writ of entry to foreclose a mortgage, whether the demandant, who claimed by an assignment of a mortgage made by Nathan P. Pratt to one Kimball, under circumstances similar to those which appear in the case at bar, had a sufficient legal title to recover possession from the mortgagor himself. It was held that he had, and Lowell, J., in giving the opinion, said: " Kimball, as a purchaser in good faith without notice, obtained a title by estoppel against the savings bank by virtue of the certificate of its recording officer that a certain vote was found upon its records."

The analogies certainly lead to this result. It is well settled, as a general proposition, that a certificate of stock in a corporation, under the corporate seal and signed by the officers authorized to issue certificates, estops the corporation to deny its validity, as against one who takes it for value and with no knowledge or notice of any fact tending to show that it has been irregularly issued, so far at least as to make the corporation responsible for the value of the stock, where it is impossible, for any reason, to recognize the possessor as a stockholder. *Thayer* v. *Stearns*, 1 Pick. 109. *Oakes* v. *Hill*, 14 Pick. 442. *Pratt* v.

*Taunton Copper Co.* 123 Mass. 110.  *Pratt* v. *Boston & Albany Railroad*, 126 Mass. 443.  *In re Bahia & San Francisco Railway*, L. R. 3 Q. B. 584.  *Hart* v. *Frontino & Bolivia Gold Mining Co.* L. R. 5 Ex. 111.  *New York & New Haven Railroad* v. *Schuyler*, 34 N. Y. 30.  *Merchants' Bank* v. *State Bank*, 10 Wall. 604.  *Warren County* v. *Marcy*, 97 U. S. 96.  *San Antonio* v. *Mehaffy*, 96 U. S. 312.

In the recent case of *Moores* v. *Citizens' National Bank*, 111 U. S. 156, it appeared that A. lent money to B. for his own use, and, as security for its repayment, and on his false representation that he owned, and had transferred to A., a certificate of stock, to an equal amount, in a national bank of which B. was cashier, received from him such a certificate, written by him in one of the printed forms which the president had signed, and left with him to be · used if needed in the president's absence, certifying that A. was the owner of that amount of stock "transferable only on the books of the bank, on the surrender of this certificate," as was in fact provided by its by-laws.  B. did not surrender any certificate to the bank, or make any transfer to A. upon its books, never repaid the money lent, and was insolvent; and the bank never ratified or received any benefit from the transaction.  It was held that A. could not maintain an action against the bank to recover the value of the certificate. But this case rests upon the ground that A. was bargaining with B. for the purchase or transfer of stock owned by him; that A. knew no certificate could be issued to her except upon a surrender of stock made by B.; that she relied upon B.'s personal representation that he had such stock, and she trusted him as her agent to make such surrender and to see the proper transfer of the stock made upon the books of the bank, which were prerequisites to the validity of her certificate; and that she did not stand in the position of one who received a certificate of stock from the proper officers without notice of any facts impairing its validity.

In the transaction we are discussing, there was no personal relation to the secretary or treasurer, so far as the petitioner was concerned.  He believed himself to be dealing with the bank through its officer, the treasurer.  He parted with his money to that officer only that it might be put by him into the

vaults of the bank. The certificate of the vote as made by the secretary informed him that the treasurer was authorized to assign the mortgage. It was not important that the same person performed the duties of both offices. The petitioner was not the less entitled to rely on the certificate which stated the authority of the treasurer.

It is contended that the proper construction of this vote, as certified, is that the treasurer is simply designated thereby as the officer by whom assignments or discharges and releases are to be made, and that it concerns only the form or method of transfer. But such construction limits the vote too narrowly. It was more than this. It gave an authority to assign, as it did to discharge. It could not be interpreted, indeed, as an authority to assign, except on receiving the value of the mortgage, any more than as an authority to discharge or release securities of the bank without payment thereof. But such value was in fact received by the treasurer. Nor, as thus construed, was the vote necessarily *ultra vires*. Whether it was or was not careful administration on the part of the trustees to permit these assignments to be made, and the mortgages to be thus turned into money, except under their own supervision or that of the investing committee, is certainly doubtful. But if they saw fit to confer this authority upon the treasurer, it was not so far beyond their power that one honestly dealing with him in the purchase of a mortgage is thereby to be deprived of the benefit of the assignment thereof.

It is further contended, that, if the bank is bound by the certificate of the secretary so far as to be estopped to deny its authenticity, an authority to assign must be treated as an authority to sell or transfer upon the receipt of the value of the mortgage, and that the transaction between the petitioner and Pratt, as treasurer, was an equitable mortgage or pledge of the mortgage transferred; that such transfer was not an absolute sale, but security only for a loan; and that this is shown by the fact that the petitioner was to reassign when his money was repaid to him, and, that he might readily return the mortgage, his own assignment was kept from the records. A mere authority to sell does not convey any authority to mortgage or pledge the property to which it relates. *Loring* v. *Brodie*, 134 Mass. 453.

The alleged vote cannot be treated as authorizing the treasurer to pledge the mortgage securities of the bank. Whether the trustees themselves had authority to procure loans of money by such means, it is not necessary to consider. If they have, they did not attempt (assuming that they are estopped to deny the vote as certified) to confer it upon the treasurer. But the transaction as made by the treasurer cannot be treated as a pledge or equitable mortgage. It was a conditional sale, by which he reserved to the bank the right to repurchase this security on certain specified terms. There was certainly no loan to the bank; no contract was assumed to be made on its behalf to repay the money advanced by the petitioner. If the mortgage had depreciated in value, the petitioner could have no remedy against the bank. Were it shown by the terms of the agreement that the contracting parties intended a pledge, even if no obligation rested upon the party entitled to redeem, this latter fact might not be important, but it is otherwise where no such intention is revealed. *Murphy* v. *Calley*, 1 Allen, 107. The fact that the bank was entitled to repurchase the security did not render the transaction the less an actual sale. While Pratt paid the petitioner the interest next falling due on the mortgage note for the bank, and thus indicated an intention to repurchase it, he did not by this act assume on behalf of the bank to receive the sum advanced as a loan, or promise to repay it.

The assignment was perhaps defectively executed. While it was signed " Reading Savings Bank," the *in testimonium* clause recites that " I, Nathan P. Pratt, treasurer of said corporation, by vote duly authorized, hereto set my hand and seal." This is not the adoption of the seal of Pratt as that of the bank (which indeed had no common seal), nor can the words of the *in testimonium* clause, which assert the seal to be that of Pratt, be stricken out. But in the case at bar this is of little importance : the note and debt secured were certainly transferred by the paper in question, and by the indorsement made on the note. If, by the defective execution of the assignment, the intention is not completely carried out, a court of equity should correct it, and treat the mortgage given to secure the debt as transferred with it. 1 Story Eq. Jur. § 166. *Batesville Institute* v. *Kauffman*, 18 Wall. 151. *Morris* v. *Bacon*, 123 Mass. 58.

The petitioner contends that, as Pratt represented the mort-gage transferred to the petitioner as a first mortgage, the previous mortgage now actually held by the bank is therefore postponed to that transferred to the petitioner. But this is to carry the doctrine of estoppel too far. Even if the treasurer had been authorized to make an assignment of the mortgage, that authority would not have enabled him to bind the bank by the assurance that the mortgage was a first mortgage. His authority is limited by the vote under which he assumes to act, and this gave him no power to bind the bank by any guaranty. *Bradlee* v. *Warren Five Cents Savings Bank*, 127 Mass. 107.

*Decree accordingly.*